## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

**UNITED STATES OF AMERICA**                                    **PLAINTIFF**

**VS.**                                    **CRIMINAL NO. 3:12-cr-113-CWR-FKB**

**ARMANDO ALVARADO**                                    **DEFENDANT**

### ORDER GRANTING MOTION TO SUPPRESS

Before the Court is the Defendant Armando Alvarado's Motion to Suppress certain evidence resulting from his detention and arrest. The Court has reviewed the submissions of the parties, the testimony, and the evidence presented at the suppression hearing; received arguments of counsel; and reviewed the recording of the stop taken from a camera installed in the officer's patrol car.[1] For the reasons stated below, the motion is GRANTED.

### FACTS[2]

On the morning of August 23, 2012, Trooper Patrick Wall, while working drug interdiction,[3] was watching the I-20 eastbound traffic in Rankin County, Mississippi, near the 62-mile marker. The traffic was fairly heavy, and based upon Wall's experience, the conditions of the road, the traffic, and the posted speed limit justified a minimum of seven car lengths between vehicles. R.9. Wall observed a small black vehicle, later identified as a Volkswagen Jetta, following too closely

---

[1]Citations to the record will be designated as "R.___." The sole witness at the hearing was Trooper Patrick Wall. The record consists of his testimony and arguments of counsel. The Court also reviewed the video recording of the stop and the activities surrounding it. Citations to that evidence will be designated as "VR ___."

[2]In an evidentiary hearing, the Court sits as a finder of fact and must resolve all disputed issues. *United States v. Willis*, 525 F.2d 657, 659 (5th Cir. 1976); Fed. R. Evid. 104 cmt. ("To the extent that [admissibility] inquiries are factual, the judge acts as a trier of fact."). The Court is required to determine the credibility of the witnesses in order to fulfill its duty to resolve the disputed questions of fact. *Willis*, 525 F.2d at 659.

[3]As Wall explained, drug interdiction teams "focus on the main interstates and highways of the state looking for people carrying drugs and people that are wanted . . . ." R.3

to a vehicle in front of it.  R.7.  After seeing the Jetta, Wall activated his blue lights and proceeded to stop the vehicle.  R.8.  Once the driver saw that the patrolman's lights were activated, the driver of the vehicle slowed down and pulled over.  Wall never drove beside the vehicle, so he saw the occupants for the first time after the vehicle had stopped.

After approaching the vehicle, Wall noticed that "there were several other people in the vehicle."  R.10.[4]  He asked the driver, Defendant Armando Alvarado, to step out of the car, state his name, and take out his driver's license.  In response to Wall's requests, Alvarado presented his driver's license, which showed that Alvarado had a Rosenberg, Texas, address.  Wall confirmed that the name on the driver's license was the same name that Alvarado had given to him.  R.11.  When Wall asked Alvarado who owned the vehicle, he answered "daughter," and a few seconds later, "my daughter" and "son-in-law."  VR 3:06-3:09; *see also* VR 4:14, 20:35-21:10 (Alvarado confirming that his daughter and son-in-law owned the car).

Wall advised Alvarado that he had been stopped for following too closely.  VR 3:15.  Wall then asked Alvarado a series of questions, including questions about the following: Alvarado's destination, VR 3:47; how long he intended to be at his destination, VR 3:56; and the purpose of his trip, VR 4:00.  In response to the series of questions, Alvarado explained that he was going to Atlanta to visit his brother and that he expected to stay three to four days.  VR 3:50-3:57.  Wall also asked Alvarado if his license was valid, if he had ever been arrested, and if he had any outstanding tickets.  VR 4:06-09.  In response to Wall's question regarding whether Alvarado had insurance papers, Alvarado said that the insurance card was in the glove compartment, which was locked and

---

[4]The record shows that there was one adult male in the front passenger seat and three individuals on the back seat–two adult females and one young boy.  R.12-13.  Although he had not driven beside the vehicle before stopping it, it is obvious that Wall was now aware of the race of the driver and his passengers.

would need to be popped open with a screwdriver that was in the trunk. VR 4:31-5:38.

   While continuing to detain Alvarado, Wall turned his attention away from Alvarado and returned to the vehicle to ask the passengers questions. At the suppression hearing, Wall testified that he "used a little" Spanish to communicate with the passengers. R.25. However, he can only be heard asking the passengers questions in English. *See*, *e.g.*, VR 5:45-7:07 ("Where are y'all headed?"; "How long are you gonna be over there?"; "Where are y'all gonna stay?"). Due to traffic noise, many of Wall's questions to the passengers of the vehicle are unintelligible on the video. In addition, Wall's microphone could not pick up any of the passengers' responses to the questions. It is apparent, however, that there was a language barrier between Wall and the passengers because Wall can be heard asking them, "How do you say . . . in Spanish?" VR 7:23.

   After questioning the passengers, Wall returned to Alvarado to ask additional questions. Wall asked Alvarado who was in the car with him, and Alvarado responded that the passengers were friends. VR 7:38. When Wall told Alvarado that the passengers said that they and Alvarado were family, Alvarado reiterated that they were just friends. VR 7:54. Alvarado explained that the passengers were from the Rosenberg (Texas) area, where Alvarado also resided, and that he was giving them a ride to Atlanta. VR 8:20. Wall then specifically asked Alvarado if the passengers were "illegal." VR 8:34. Alvarado answered, "I don't know." VR 8:35.

   Wall asked Alvarado how long he was going to be in Georgia and whether he had any clothes. Alvarado answered that he would be in Atlanta three or four days and that he did, in fact, have clothes which were in the trunk of the car. VR 8:58-9:07.

   At the suppression hearing, the attorney for the government specifically asked Wall about any inconsistent or conflicting statements, and Wall explained as follows:

3

> [Alvarado] said they were family.  The passenger said they were just friends.
> [Alvarado] couldn't tell me their names.  They couldn't tell me his name.  The fact
> that he's driving first he said his daughter's car and then I believe he said his brother-
> in-law's car, it's probable, . . . it's possible that you know the stars could align and
> he's borrowing whoever's vehicle and the owner's not there driving some friends that
> he doesn't know to Atlanta or wherever they said they were going, I mean it's
> possible but it's just not probable and that is [when] I [then] went ahead and
> contacted Francisco [Ayala].[5]

R.26.  The video does not, however, show Wall ever asking Alvarado the passengers' names.

     More than fifteen minutes into the stop, Wall returned to his vehicle to run a license check.

Through the conversation with the dispatcher, Wall learned that Alvarado had been arrested

previously for "smuggling aliens."  VR 16:51.  Wall advised the dispatcher that he was going to ask

to search the vehicle, VR 17:17, and he explained that he believed Alvarado was "hauling illegals,"

VR 17:20.  Wall then obtained the phone number for Ayala and called him.  He informed Ayala that

he thought he had a "small load," noting that "it's not but three of them in there."  VR 18:14.  Wall

explained that he believed the driver was a United States citizen who had a past–"a criminal history"

of "smuggling aliens."  VR 18:20-25.  He then asked Ayala, "Are you interested?"  VR 18:26-18:30,

and he gave Ayala his specific location.  *Id*.

     Nearly twenty minutes into the stop, Wall returned to Alvarado and advised him that he was

not going to give him a ticket, VR 18:58, but that he simply needed to document the stop, VR 19:00.

*See also* R.38.  Even though Wall testified during the hearing that he only intended to document the

stop and did not intend to write a ticket, Wall also explained that Alvarado was not free to leave

"until [Wall] knew what was going on with [Alvarado] and the passengers in the vehicle."  R.46.

     After speaking to the dispatcher and Ayala, Wall began questioning Alvarado about his

---

[5]Francisco Ayala is an agent with U.S. Immigration and Customs Enforcement (ICE).

previous arrests.   Alvarado explained that he was arrested for assault and for transporting undocumented immigrants.  With respect to the arrest for transporting undocumented immigrants, however, Alvarado explained that he was released "right away."  VR 19:50-20:07.[6]  Wall then asked Alvarado if he had been arrested for "hauling drugs," VR 20:17, to which Alvarado answered, "No. Never."  VR 20:20.  He also denied having drugs in his car when asked.  Nevertheless, Wall asked for permission to search the vehicle, and according to Wall, Alvarado consented.[7]

 By the time Alvarado consented to the search, Trooper Jamie Puckett had arrived on the scene, and he assisted in conducting the search.  The search took nearly fifteen minutes.  VR 26:41-41:37.  During this entire time, Alvarado was standing at the rear of the vehicle beside the road, where Wall had directed him to stand, and the other occupants had also exited the vehicle.

Just as the troopers completed their search, immigration officials arrived on the scene.  There is no evidence that anything illegal was found in the vehicle, but Alvarado and his passengers were arrested.  A criminal complaint was returned against Alvarado charging him with "knowingly transport[ing] illegal aliens within the United States."   Docket No. 1, at 1 (citing 8 U.S.C. § 1324(a)(1)(A)(ii)).

---

[6]According to Wall, the fact that Alvarado had been arrested for smuggling raised his suspicions.  R.25.  It is obvious to the Court that Wall relied upon that "history" to bolster his suspicion that Alvarado was engaged in illegal conduct.  *See* VR 29:45-30:10 (showing Wall telling someone on a telephone call that Alvarado had a history; that Alvarado had previously been arrested, but that Wall was not sure if Alvarado had been charged; and that Alvarado told Wall that "they let him go").

[7]The Court finds that the request to search the vehicle, VR 20:30, came after Wall informed Alvarado that Wall was only going to document the stop and not issue the ticket.  Presumably, Alvarado should have been free to leave.  Yet, Wall had not returned Alvarado's license to him, and Wall continued to question Alvarado.  It is clear that Alvarado was not free to leave.  R.46.

## LEGAL STANDARD

Generally, a defendant who seeks to have evidence suppressed bears the burden of proving that evidence was seized illegally.  *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).  However, when a seizure is conducted without a warrant, the burden shifts to the government to show that the seizure was reasonable.  *Id.*  In this instance, the government carries the full burden of proving, by a preponderance of the evidence, that the stop and subsequent detention of Alvarado were objectively reasonable according to Fourth Amendment standards.  *See id.*; *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

## ANALYSIS

The Fourth Amendment to the United States Constitution provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  It is universally understood that the temporary detention of individuals during a routine traffic stop constitutes a limited Fourth Amendment seizure.  *See United States v. Estrada*, 459 F.3d 627, 630-31 (5th Cir. 2006).

In the context of traffic stops, limited searches and seizures are justified when police have reasonable suspicion supported by articulable facts that a crime has been or is being committed.  *Id*.  However, once a stop has occurred, an officer does not have limitless time to detain a motorist as the officer attempts to discover another  violation.  *See id.* at 631 ("Once the purpose of a valid traffic stop has been completed and an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts.").

In *United States v. Santiago*, the Fifth Circuit Court of Appeals explained as follows:

> During a traffic stop, an officer can request a driver's license, insurance papers, and vehicle registration; he or she may also run a computer check and issue a citation. *The officer may detain and question the subjects of a traffic stop during the time a computer check is being conducted.* Furthermore, [the Fifth Circuit] usually does not scrutinize the particular questions asked during a stop so long as they tend to relate to the purpose of the stop.
>
> *   *   *
>
> However, a Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. *Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave.*

310 F.3d 336, 341-42 (5th Cir. 2002) (citations omitted) (emphasis added).  *See also United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (stating that an officer may check to see if a driver has any outstanding warrants, determine whether the vehicle is stolen, and question the driver about the purpose and itinerary of his trip); *Estrada*, 459 F.3d at 631 (stating that an officer may ask a driver questions unrelated to the reason for the stop); *United States v. Rodriguez-Flores*, 249 F. App'x 317, 320 (5th Cir. 2007) (unpublished) (stating that an officer may question occupants of a vehicle before performing a computer check as long as the questioning is related to the reason for the stop or to reasonable suspicions that subsequently arose, and that the officer may question occupants about subjects unrelated to the reason for the stop while awaiting the result of the computer check (citing *United States v. Brigham*, 382 F.3d 500, 510-11 (5th Cir. 2004); *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993))).  In other words,  generally, once "all computer checks come back clean, . . . reasonable suspicion disappears, and there is no legitimate reason for extending the stop." *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006) (citation omitted).  A stop may, however, be extended  beyond the original purpose of the stop "if additional

reasonable suspicion arises in the course of the stop and *before* the initial purpose of the stop has been fulfilled." *Id.* (quotation marks and citation omitted) (emphasis added). In such cases, "the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.* (quotation marks and citation omitted).

In making reasonable suspicion determinations, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quotation marks and citation omitted). The detaining officer must be able to "point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Estrada*, 459 F.3d at 631. He is permitted to draw on his own experience and specialized training to make inferences about the cumulative information before him. *Id.* at 632. That cumulative information which the officer finds of value may elude an untrained person. *Id.* (*citing Arvizu*, 534 U.S. at 273).

In drawing on his experience, the officer may not, however, simply rely on some inarticulate and unparticularized hunch of wrong-doing. *See Rodriguez-Flores*, 249 F. App'x at 320-21. Uneasy feelings will not do either. *See Estrada*, 459 F.3d at 631 (*citing Santiago*, 310 F.3d at 338-39). Further, "[s]uspicions clearly based on lawful conduct, or at least conduct in which law-abiding citizens are just as likely to be engaged, are not reasonable." *United States v. Lopez*, 817 F. Supp. 2d 918, 926 n.57 (S.D. Miss. 2011) (citing *United States v. Rangel-Portillo*, 586 F.3d 376, 381 (5th Cir. 2009)).

1.      Was the Stop Reasonable?

Pursuant to Miss. Code Ann. § 63-3-619, "[t]he driver of a motor vehicle shall not follow

another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Wall testified that at the time he stopped Alvarado, a vehicle traveling 70 miles per hour should have had no less than seven car lengths between it and the vehicle in front of it. R.8-9. Based on Officer Wall's testimony and the Court's review of the video recording, when Wall decided to stop Alvarado, less than seven car lengths separated the Jetta that Alvarado was driving and the vehicle in front of it. Thus, Wall not only had a reasonable suspicion that a traffic violation had occurred, but he also had probable cause to stop Alvarado. *See Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

To the extent that Alvarado claims that he was not the only driver who was following too closely, and that consequently his stop was not based upon a reasonable suspicion or probable cause, that argument is unavailing. Although other drivers appeared to have been speeding and also following too closely, that particular morning was Alvarado's unlucky day.[8] Officers are not required (nor is it possible) to stop every driver who violates various rules of the road.

2.     Was Wall's Post-Stop Questioning Permissible?

Because the initial stop was valid, the next issue to be examined is whether Wall's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place. *United States v. Jackson*, No. EP-10-CR-1628-KC, 2010 WL 4023553, at *2 (W.D. Tex. Oct. 13, 2010) (quotation marks and citation omitted). As noted above, once Alvarado was stopped, Wall was well within his authority to obtain Alvarado's identity, request to

---

[8]As Wall testified, Alvarado "drew the lucky . . . number." R.41.

examine his driver's license, request the vehicle's registration papers, request insurance papers, and run a computer check on Alvarado and his vehicle.   Additionally, Wall could ask questions of Alvarado about his itinerary, including where he was coming from, where he was going, and how long he intended to stay at his destination.   *Lopez*, 817 F. Supp. 2d at 927.   The evidence suggests that Wall posed these various questions and elicited this information.   The relevant inquiry, however, is at what point the questioning and investigation should have concluded.

On this issue, the Court is guided by *United States v. Jenson*, 462 F.3d at 402-09.   In that case, a state trooper stopped a van for speeding.   *Id.* at 402.   The van took between 30 seconds and a minute to stop.   *Id.*   There were three people in the van:  the driver, Tommie Jenson, a woman, and Jenson's uncle, Cotton.   *Id.*   After asking Jenson to exit the vehicle, the trooper questioned him about his employment and the purpose of his trip.   *Id.*   Jenson said that he worked in construction with his uncle, Cotton, and that they were on their way to pick up his uncle's wife.   *Id.*   The trooper obtained Jenson's and his passengers' licenses and ran the licenses.   *Id.*   They came back clear at 11:02 p.m. *Id.*   The trooper admitted that he was "probably close to finish" writing the warning by the time dispatch informed him of the results of the license checks.   *Id.*

At some point, the trooper noticed that Jenson had begun to talk excessively and answer questions that the trooper had not asked, and thus the trooper surmised that Jenson was nervous.   *Id.* This behavior continued even after Jenson was issued the written warning, which the trooper found to be suspicious given his prior experience that drivers typically become less agitated once they realize they will not receive a citation.   *Id.* at 402-03.

Two minutes after the licenses were cleared, the trooper continued to interrogate Jenson. When asked where he worked, Jenson said "Tommie and Cotton" or "Tommie-Cotton."   *Id.* at 403.

10

However, when asked the same question, Cotton said that the business did not have a name. *Id.* The trooper found this discrepancy to be suspicious and asked to search the van. *Id.* Permission was granted. *Id.* There was no indication that Jenson had been told that he was free to leave. *Id.* The trooper found a pocket-knife and gun on Jenson while frisking him for safety purposes. *Id.* A criminal background check revealed that Jenson was a felon, so he was arrested for being a felon in possession of a firearm. *Id.* Marijuana was also found in his socks, which led to a charge of being an unlawful user of a controlled substance in possession of a firearm. *Id.* Jenson filed a motion to suppress, which was denied,  and he was convicted on both charges. *Id.*

On appeal, the Fifth Circuit concluded that the following circumstances on which the government relied did not provide a reasonable suspicion of criminal activity:  the length of time it took Jenson to pull over, Jenson's nervousness as exhibited by his excessive talking, and Jenson's and Cotton's inconsistent answers. *Id.* at 404.  The court refused to consider Jenson's and Cotton's contradictory statements because they occurred after the licenses had cleared and the initial purpose of the stop had concluded.  *Id.*  Furthermore, the court determined that Jenson's and Cotton's statements did not give rise to reasonable suspicion because "Tommie-Cotton" or "Tommie and Cotton" could have been a descriptive name for the company which had no name.  *Id.*

The court held that the remaining circumstances on which the government relied, the amount of time it took Jenson to pull over and his apparent nervousness, did not amount to reasonable suspicion to justify prolonging the detention. *Id.*  Furthermore, the court concluded that Jenson  did not voluntarily consent to the search, and that consequently, by the fruit of the poisonous tree doctrine, "all evidence derived from the . . . illegal search . . . must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that

the evidence was a product of the constitutional violation." *Id.* at 406-09 (citation omitted).  Because the police would not have searched Jenson and discovered the gun or marijuana if the stop had not been illegally extended, the court suppressed the evidence.  *Id.* at 408.

Like Jenson, Alvarado could be detained long enough to complete the computer check, and he and the passengers could be questioned during that time.  However, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." *United States v. Sanders*, 994 F.2d 200, 203-04 (5th Cir. 1993) (footnote omitted).  Here, the only purpose for stopping Alvarado was either to ticket him or to warn him about following too closely to the vehicle in front of him.  *See* R.17, 38, 46 (including testimony that Wall did not write Alvarado a citation, but merely documented the stop); VR 18:58-19:00.  Thus, Wall could prolong Alvarado's detention only if he developed additional reasonable suspicion that a crime was being committed.  Although Wall may have been suspicious of certain circumstances, his suspicions, as explained more fully below,  should have dissipated when the computer check came back clear.  *See Estrada*, 459 F.3d at 631; *Jenson*, 462 F.3d at 404; *Santiago*, 310 F.3d at 341-42 ("Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave.").[9]

---

[9]Extended detention becomes unreasonable seizure because it is not supported by probable cause. *Michigan v. Summers*, 452 U.S. 692, 700 (1981) ("[E]very seizure having the essential attributes of a formal arrest [] is unreasonable unless it is supported by probable cause.").  There is no bright line rule directing the limits of how long a stop lasts until it is deemed unreasonable.  The Fifth Circuit, for example, has explained that detention between 10 and 30 minutes is reasonable.  *See United States v. Campbell*, 178 F.3d 345, 350 (5th Cir. 1999) (citing *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991)). *See also United States v. Sharpe*, 470 U.S. 675, 688 (1985) (concluding that 20-minute stop was not *per se* unreasonable but explaining that only a short pre-arrest detention would have taken place but for the evasive actions of the suspects); *United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000) (handcuffing female defendant and detaining her in patrol car for 75 minutes was not unreasonable because there was no female officer available to search her for weapons).  As will be explained in more detail below, nothing about Alvarado's conduct justified his continued detention after the records check came back clear. Alvarado was cooperative the entire time that he was forced to remain outside of his vehicle on the side of the road.  The stop went beyond the temporary line.

3.      Was Alvarado's Detention Constitutional After the Purpose of the Stop Concluded?

In reviewing the video recording and the testimony, it is clear to the Court that Wall intended to search Alvarado's vehicle at all costs.  *See* VR 17:17 (Wall advising dispatcher that he was going to ask to search the vehicle).  To get to that point, Wall would need reasons to detain Alvarado, but the  reasons provided at the hearing provide no basis for Alvarado's continued detention.

When initially pulled over, for example, Alvarado complied with Wall's request.  He gave his name, stepped out of the car, went to the rear of his vehicle, and presented his license to Wall.  The name on the license was the same as Alvarado had given Wall, and as noted above, the license was in order.  There is nothing suspicious about that.[10]  Alvarado explained that the vehicle was his daughter's, and that the insurance papers were in the locked glove compartment.  He informed Wall that there was a screwdriver in the trunk of the car that could be used to open the glove compartment.  Indeed, even after the information from the computer check was clear, Wall continued to detain Alvarado.  The government, however, points to other circumstances which it argues caused Wall to have reasonable suspicion and which justified Alvarado's continued detention.

The Court finds that some of the "discrepancies" that Wall and the government rely on are not supported by objective evidence.  As explained below, there were no discrepancies between Alvarado's and the passengers' responses regarding who owned the car and their travel destination.

---

[10]The Court acknowledges that at this point, Wall was "armed" with additional information.  He was aware that the vehicle had a Texas license plate, which he had not seen before he decided to stop the car.  R.41.  He also observed the race and ethnicity of the driver and occupants and the number of occupants in the vehicle, and he learned that the driver's surname was Alvarado.  The fact that the car had a Texas license plate provides no cause for reasonable suspicion.  The interstate highway system is designed to permit citizens of one state to cross state lines in their travels.  Similarly, the race or ethnicity of the driver and passengers provides no justification for reasonable suspicion and thus continued detention.  "[E]thnicity alone cannot supply reasonable suspicion." *Lopez*, 817 F. Supp. 2d at 926 n.57 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-87 (1975)).  To sustain the stop and continued seizure on this evidence alone would be tantamount to authorizing officers to detain all Hispanic-looking persons who travel interstate in vehicles with Texas license plates.

13

Additionally, Wall's testimony on the alleged discrepancy between the passengers' and Alvarado's statements regarding their relationship with each other conflicts with the video, and therefore, the Court finds that the testimony lacks credibility and carries no weight in justifying a prolonged detention.  After reviewing the totality of the remaining circumstances on which the government relies in attempting to justify the investigation that occurred after the purpose of the stop was fulfilled, the Court concludes that those circumstances do not give rise to a *reasonable*[11] suspicion of criminal activity.

      a.      Unfounded Allegations of Inconsistent Answers/Statements

            i.      *Ownership of Vehicle*

At the suppression hearing, Wall and counsel for the government argued vigorously that a change in Alvarado's story about the ownership of the vehicle he was driving provided a basis for Wall's suspicion of Alvarado.  R.18, 25-26, 84.  They contend that Alvarado first claimed that the vehicle was owned by his daughter, but that when asked again, he said that his brother-in-law owned the vehicle.  The government honed in on this point during the suppression hearing:

> [Gov't Attorney]: Now, you said he told you it was his daughter's vehicle.  Did there come a time he told you something different as to who owned that vehicle?
>
> [Wall]: He also said it was his brother-in-law or - - yes, brother-in-law's vehicle.  He changed his story from his daughter's vehicle to somebody else's.  If I remember correctly, it was his brother-in-law.

---

[11]The Court has no doubt that Wall subjectively suspected that Alvarado was transporting undocumented immigrants.  In other words, he had a hunch.  However, the relevant inquiry is whether that suspicion was reasonable in light of the circumstances.

R.18.[12]  The government, however, is mistaken.  The video of the stop clearly shows that Alvarado said the vehicle was owned by his daughter and *son-in-law* (her husband).[13]  *See* VR 3:06.  In fact, Wall must have actually heard Alvarado attribute ownership to his son-in-law because after being told that the car belonged to Alvarado's daughter and son-in-law, Wall asked, "where are *they* at?" VR 4:17-18 (emphasis added).  Later, after the computer check came back clear, he asked Alvarado, "You say, this is your *son-in-law* car?  Your daughter?"  VR 20:35 (emphasis added).  Alvarado replied by spelling and even offering to write the name of his son-in-law.  VR 20:38-21:10.

Because the evidence shows that there was no discrepancy in Alvarado's statements about the car's owners, those statements could not form the basis of reasonable suspicion.  Wall's suspicions may have been justified if in one breath Alvarado claimed that the vehicle belonged to his daughter, and in the next breath he said that it belonged to his brother-in-law, but no suspicions are justified when a father explains that he is driving a vehicle which belongs to his daughter and her husband, who is also the driver's son-in-law.

ii.     *Destination Atlanta*

The government also relies on a perceived discrepancy in answers about where Alvarado and the passengers were going.  The video demonstrates that there was no such discrepancy because both Alvarado and the passengers said they were destined for Atlanta.

The Court's review of the video reveals that Alvarado said he was going to stay with his

---

[12]It is worth noting that the evidence was presented through Wall's testimony without the benefit of the video recording.  The government then played the hour-long recording and entered it into evidence.  After the recording was entered into evidence, Wall was asked a few follow-up questions, subjected to cross-examination, and re-examined by the government.  After the hearing, the Court reviewed the recording thoroughly.

[13]Interestingly, counsel for the defendant never challenged the government's assertion that Alvarado said that the vehicle belonged to his brother-in-law.  Instead, counsel for the defendant spent most of his argument challenging the sequence of events.  *See* R.83-84.

15

brother for three to four days, *see* VR 3:50-3:57, and he had a suitcase which suggested that he would stay for a period of time.  VR 8:58-9:07.  The fact that Alvarado had a suitcase should have allayed some of Wall's suspicions.

The government acknowledges that the passengers also said they were going to Atlanta "to stay with their family."  R.58.  When Wall sought to clarify Alvarado's response regarding where Alvarado and the passengers would be staying in Atlanta, Alvarado confirmed that the passengers were not going to Atlanta to visit *his* brother, but that they would stay in Atlanta.  VR 8:00-8:08.  There is nothing about Alvarado's and the passengers' statements regarding their destinations which provided a reasonable basis for extending Alvarado's detention.

### iii.  *Relationship Between Driver and Passengers*

The government also points to an alleged discrepancy between Alvarado's and the passengers' answers about how they know each other.  Wall testified that Alvarado said that he and the passengers were family, but that the passengers stated that they were just friends with Alvarado and could not tell Wall Alvarado's name.  R.26-27.  Specifically, Wall testified that when he confronted Alvarado "about [the passengers] saying that they were just friends[,] he kind of – he changed his story and made it sound like distant relatives or something along  those [lines]."  R.27.  However, the video shows that Alvarado initially identified the passengers as friends, and when Wall told him that the passengers said they were family, Alvarado confirmed that the passengers were "friends only."  VR 7:37-7:56.

Notably, contradicting his own testimony, Wall also testified at the suppression hearing that Alvarado said the passengers were just friends, R.14, but that the passengers "said they were family."  R.13; *see also* R.14 ("They said that he was family.").  To further support his point, Wall testified

16

that he asked Alvarado what the passengers' names were, but Alvarado could not tell him.  R.14-15.

However, the video does not show Wall asking Alvarado the names of the passengers.[14]

In light of Wall's inconsistent testimony and the contradiction between Wall's testimony and the video, the Court finds that Wall's testimony on this issue lacks credibility.  Because this alleged discrepancy is unsupported by the record, it is not a basis on which the government can satisfy its burden to show that there was  reasonable suspicion that Alvarado was engaged in criminal activity.

Even if such a discrepancy existed, courts have determined that inconsistent stories and inconsistent answers to questions do not always constitute articulable facts that support reasonable suspicion.  *See Estrada*, 459 F.3d at 631-32; *Santiago*, 310 F.3d at 342.  Even where the inconsistent answers concerned the relationship of the driver and passenger, courts have found that there is no cause for reasonable suspicion.  *See, e.g.*, *United States v. Jones*, 234 F.3d 234, 237-38 (5th Cir. 2000) (finding no reasonable suspicion to prolong traffic stop despite the fact that one passenger identified the other as his "uncle," while the second passenger identified the first as his son-in-law's brother, not his nephew); *Jackson*, 2010 WL 4023553, at *4 (finding that inconsistency between driver and passenger concerning their familial relationship was not grounds for suspicion).

In the present case, even if Wall actually thought there were inconsistent statements between Alvarado and his passengers about their relationship, such discrepancies may have been the result of miscommunication or misinterpretation between Wall and the passengers, as there was an obvious

---

[14]To the extent Wall's testimony relates to questioning that occurred after Wall completed the records check, and therefore, after the purpose of the stop had been fulfilled, those exchanges could not provide a reasonable basis for prolonging Alvarado's detention.

language barrier between the communicants.[15]  *See United States v. Padilla*, No. 4:10-cr-24-DCB-FKB, 2011 WL 2110305, at * 1, 8 (S.D. Miss. May 25, 2011) (finding that passenger and driver's discrepancy concerning their past itinerary "could easily be the result of miscommunication rather than lies").  Consequently, the inconsistencies, when considered in conjunction with the other facts on which the government relies, would not give rise to a reasonable suspicion of criminal activity.

> b.     Totality of the Remaining Circumstances

Having determined as unfounded the government's assertion that inconsistent statements supported Wall's decision to prolong Alvarado's detention, the Court considers the totality of the remaining circumstances on which the government relies:  Alvarado's prior arrest and the language spoken by the passengers.  These circumstances do not give rise to a reasonable suspicion of criminal activity, especially given other circumstances of the stop such as the number of passengers in the car.

> i.     *Alvarado's Previous Arrest*

The major information on which the government relies is the fact that Alvarado had a prior arrest – not conviction – for what Wall referred to as "human smuggling."  R.16.  This arrest history, according to the government, justified Wall's elevated level of reasonable suspicion.  R.53-55.  It appears to the Court that once Wall learned of the previous arrest, bells, whistles, and even fireworks went off in his mind, and to him, his hunches had been confirmed.

After obtaining the information concerning Alvarado's destination, Wall asked Alvarado if his license was valid, to which he responded, "Yes."  VR 9:13.  Wall then told Alvarado, "Let me get one second and I will get y'all on the way."  VR 9:16-22.  Wall returned to his vehicle to run the

---

[15]Wall acknowledges that he can only speak a "little" Spanish.  R.12-13.  Indeed, in reviewing the video, the Court could only hear Wall speak to the passengers in English.  At one point, he asked the passengers, "How do you say . . . in Spanish?"  VR 7:23.  It is undisputed, however, that the passengers did not speak English.  R.54.

computer check.  Notably, at this point in the stop, less than ten minutes had elapsed.

Wall communicated with the dispatcher and obtained information about Alvarado and the vehicle he was driving.  VR 10:38-12:37.  Wall asked the dispatcher, "What was . . . the . . . smuggling case . . . about?"  VR 14:27-32.  Although the audio does not reveal what information the dispatcher provided,  more than two minutes later, Wall said to the dispatcher, "okay, so he has been *arrested* before for smuggling aliens?"  VR 16:52-17:12 (emphasis added).  He then explained to the dispatcher that he was going to ask Alvarado if he could search his vehicle because he *believed* Alvarado was "hauling illegals" at that time.  VR 17:17-20.  At Wall's request, the dispatcher provided him with a telephone number.  VR 17:23-41.  Wall called Ayala and informed him that he believed he had a "small load" since there were only "three of them in there."  VR 18:13-18.  Wall explained to Ayala that the driver was likely a U.S. citizen, but that "he's got a past of smuggling aliens, and he's got a criminal history of doing stuff like this."  VR 18:18-25.  He asked Ayala if he was interested and provided his location.[16]

Next, Wall exited his vehicle, returned to Alavarado, and advised him that he would not issue a ticket, but that he would document the stop.  VR 19:00-02.  He then asked, "What all you been arrested for?"  VR 19:11-18.  In response, Alvarado informed Wall about prior arrests, including an assault charge.

Wall proceeded to ask specific questions concerning Alvarado's prior arrest for "smuggling."  VR 19:46-47.  Alvarado provided details of the arrest, but noted that he was "released . . .  right away."  VR 19:48-20:10.  Wall asked Alvarado if he had ever been arrested for "hauling drugs," to

---

[16]It is clear to the Court that having been advised that Ayala was enroute, Wall had no intention of allowing Alvarado to leave even though the computer check had come back clear.  Wall and Puckett conducted a search of the vehicle that was not completed until shortly before Ayala arrived.

which Alvarado responded, "No. Never." VR 20:14-20:18. Wall replied, incredulously, "You haven't?" Alvarado answered, "Never." VR 19:50-20:23. Wall then asked Alvarado if there were drugs in his vehicle. Alvarado answered, "No." Wall followed up by asking him to allow Wall and another trooper who had arrived on the scene to search the vehicle.[17] VR 20:25-36. Wall continued to question Alvarado, VR 20:33-21:08, and later, the second officer asked Alvarado a series of questions, many of which were the same that Wall had asked. VR 21:22-22:30.

The government claims that Wall was justified in having a heightened level of suspicion because Alvarado had been arrested previously for "smuggling aliens." *See* R.80-81; *see also* R.25 (including Wall's testimony that he called for ICE because of Alvarado's "criminal history having the prior charge of alien smuggling, human trafficking, whatever . . . ."). Indeed, the government was adamant in its position. *See, e.g.*, R.53 ("The trooper at that point became suspicious when he ran the record check, the record check did not come back clear. It indicated he had a prior arrest for smuggling."); R.59 (explaining that information received from the dispatcher regarding Alvarado's previous arrest was among the facts available to Wall); R.77 ("[Alvarado's] records did not come back clean. It showed a previous arrest and that in the officer's mind was enough to give him new suspicions that something was afoot . . . ."); R.80 ("But when [Wall] . . . ran the records check that record check did not come back clear. . . . So when that check came back in he had been arrested, that arose [ ] suspicions in the officers's mind"). *But see* Response in Opposition to Defendant's Motion to Suppress Evidence, Docket No. 26, at 3 (asserting that Wall had received information

---

[17]At VR 19:30, a second trooper, Jamie Puckett, can be seen in the recording for the first time. Puckett walked up to the vehicle, peered into it, and returned to the area where Wall continued to question Alvarado. At times during the recording, Wall can be seen and heard posing questions to the vehicle's occupants. Also, Puckett can be seen and heard posing questions to Alvarado, but the government has not alleged or argued that information that Puckett learned provided reasonable suspicion for Alvarado's continued detention. Puckett did not testify, so there is no such evidence before the Court.

from the dispatcher that "Alvarado had a previous *conviction* for smuggling illegal aliens in the United States") (emphasis added).[18]   However, as one court explained, "past criminal history, 'by itself, does not create a reasonable suspicion that criminal activity is currently afoot, which is what the Supreme Court requires.'"   *United States v. Eskichyan*, No. 09-CR-152-RET-SCR, 2010 WL 4054295, at *6 (M.D. La. Oct. 13, 2010) (citations omitted).

   In the present case, the Court finds that Alvarado's arrest history could not form the basis of reasonable suspicion.  The Court flatly rejects the  government's suggestion that once someone is arrested, he should forever carry that scarlet letter as notice to all law enforcement officers that he may be detained based on reasonable suspicion arising from the previous arrest.  In order to ratify this argument, the Court would have to trample all over the Constitution.  As Chief Judge Tyson explained, "many – if not most – interstate travelers would be subject to prolonged detention." *Id.* at *7; *see also United States v. Mathurin*, 561 F.3d 170, 177 (3d Cir. 2009) (stating that past criminal conviction, never mind arrest record, is not sufficient alone); *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011) (stating that an officer is required to pair his knowledge of detainee's criminal record with some concrete factors to demonstrate that there was a reasonable suspicion of *current* criminal activity).  Another court has explained the point more clearly:

> If the law were otherwise, any person with any sort of criminal record–or even worse, a person with arrests but no convictions–could be subjected to an investigative stop by a law enforcement officer at any time without the need for any other justification at all.  To find reasonable suspicion in this case could violate a basic precept that law-enforcement officers not disturb a free person's liberty solely because of a criminal record.  Under the Fourth Amendment our society does not allow police officers to "round up the usual suspects."

---

[18]Nothing in the evidence suggests that Alvarado had been convicted previously of "smuggling aliens," and this apparently is a misstatement by the Government.

*United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011) (brackets and citation omitted).

Regardless of how vigorously the government argues to the contrary, Alvarado's prior arrest, when considered in conjunction with the other circumstances on which the government relies, did not justify Alvarado's prolonged detention.[19]

### ii.    *Spanish-Speaking Passengers*

Many times throughout its arguments during the suppression hearing, as well as in its brief, the government appeared to rely on the fact that the passengers did not speak English–or more importantly, that they spoke Spanish–as a justification for Wall's suspicion that something illegal might have occurred or was occurring.  *See* R.53-54, 81 ("So at that point he has in his mind passengers who are from–illegally at that moment who do not speak English . . . ."); R.56 (stating that Wall "could tell . . . that they spoke Spanish"); Docket No. 26, at 3 ("Trooper Wall is suspicious that the passengers are illegally in the United States based upon the back seated passengers not understanding English . . . .").  However, speaking English is not a prerequisite for interstate travel, and that one travels without the ability to speak English does not suggest that a crime is being committed.  As this Court has previously noted, assumptions of illegality based on stereotypes hurled at Hispanic persons should not be tolerated.  *See Lopez*, 817 F. Supp. 2d at 923 n.27 (rejecting

---

[19]Wall also testified that Alvarado "lied to [him] about his arrest record."  R.15.  The Court is doubtful of that characterization of Alvarado's responses.  Upon review of the video, the Court notes that before the records check, Wall asked Alvarado several questions in rapid succession, including whether he had previously been arrested.  VR 4:03-4:10 ("Is your license valid? No tickets?  Nothing like that?  You ever been arrested before?").  Alvarado's complete response cannot be heard on the video because of traffic noise, although he finished by saying "everything clear."  *Id.*  Given the manner in which Wall asked several questions at one time, it is not clear which question or questions Alvarado was answering.  However, when Wall later asked Alvarado about a "smuggling" arrest, Alvarado explained that he had been immediately released, which would support his statement that everything is clear.  VR 19:48-20:10.  To the extent the government suggests that Alvarado's responses regarding his arrest record contributed to Wall's suspicions, the Court concludes that the responses, when viewed in context with all of the questions that Wall asked at that time and in conjunction with the other circumstances on which the government relies, do not give rise to reasonable suspicion.

officer's view that a Hispanic-looking person should be presumed to have entered the country illegally unless he proves otherwise by showing documentation).

The Constitution that Wall and counsel for the government have sworn to defend does not include one sentence about an official language. *Harris v. Rivera Cruz*, 710 F. Supp. 29, 31 (D.P.R. 1989) ("In the United States, there is no official language, and if prudence and wisdom (and possibly the Constitution) prevail, there never shall be."); *see also* Mark L. Adams, *Fear of Foreigners: Nativism and Workplace Language Restrictions*, 74 Or. L. Rev. 849, 855 (1995) (explaining that because of the United States' linguistic diversity, the Constitution does not mention an official language). Our highways are open to citizens who speak English (of which Alavarado is one); citizens who speak Spanish (of which Alvarado is one); and people who speak any one of the approximately 325 languages[20] spoken in this country. As such, a law enforcement officer should not assume that just because someone speaks Spanish, but not English, he or she is in this country illegally. Under the circumstances of this case, the fact that the passengers were Spanish-speaking did not justify Alvarado's continued detention after the purpose of the stop had been fulfilled.

### iii. *Other Circumstances and Conclusion*

When Wall made the call to inquire about whether ICE wanted to investigate further, he advised ICE that he suspected Alvarado was involved in illegal "smuggling" because he had a previous arrest, although he noted that Alvarado only had a "small load." It was indeed a "small load." Alvarado was driving four passengers in a Volkswagen Jetta: a person in the front passenger seat and two adults and a small child in the back seat of the car. Absolutely nothing about this

---

[20]*See Languages Spoken in the United States: 2006-2008 Census Data*, at http://us-english.org/view/24 (listing the 325 known languages spoken in this country) (last visited Oct. 1, 2013).

number of passengers in a vehicle of this size should raise any suspicion that one is involved in transporting undocumented immigrants. Although the number of passengers in a vehicle could lead to reasonable suspicion of criminal activity, *see United States v. Chavez-Chavez*, 205 F.3d 145, 148 (5th Cir. 2000), five persons (including the driver, Alvarado) in a five-passenger vehicle is not inconsistent with a group of people lawfully traveling from one place to another. *See United States v. Fonseca-Ramos*, 743 F. Supp. 487, 490 (N.D. Tex. 1989) (noting that although the Fifth Circuit may not have defined exactly what an "unusually large number of passengers" is, it stands to reason that the car must be carrying more passengers than it was designed to hold comfortably). *Cf. United States v. Fuentes*, No. C-09-860, 2010 WL 707424, at 1, 3 (S.D. Tex. Feb. 23, 2010) (finding that five men on the back seat of a Toyota pickup truck, with four of the men seated on the floor board while the fifth man lay across the laps of the other four men, gave officer reasonable suspicion to believe that the five men were illegal aliens).

Furthermore, the present case is distinguishable from others in which officers had stronger indicators that occupants of a vehicle might be undocumented immigrants to supplement facts that, without more, would be insufficient to establish reasonable suspicion. For example, in *United States v. Rico-Soto*, the Fifth Circuit determined that a Border Patrol agent had reasonable suspicion to stop a van based on numerous observations of the officer, including the fact that the van had the name "Paisanos" on its side, at a time when "intel reports showed 'Paisanos' vans had recently become active in transporting illegal aliens." 690 F.3d 376, 379-80 (5th Cir. 2012). Similarly, in *Lopez-Moreno*, 420 F.3d at 432-34, the Fifth Circuit determined that an officer had reasonable suspicion to prolong the detention of the driver of a van when, because of the officer's prior experience, he was armed with knowledge that the same type of van had been involved in an earlier undocumented

immigrant traffic stop. *Id.* at 433. Through questioning and observation, the officer learned, among other things, that the van was full of passengers, and the driver conceded that the passengers "might be present in the United States illegally." *Id.* Although the court determined that some of the factors considered–for example, the fact that the driver did not know the names of the passengers–would not, standing alone, provide reasonable suspicion, the court found that there was reasonable suspicion when all of the factors were viewed together. *See Lopez-Moreno*, 420 F.3d at 425, 433.

In this matter, the government has not shown that the totality of circumstances is comparable to that in *Rico-Soto* and *Lopez-Moreno*. Rather, the innocuous circumstances on which the government relies fail to collectively provide a reasonable suspicion of criminal activity. An American citizen providing an interstate ride to four Spanish-speaking individuals does not provide reasonable suspicion of criminal activity, even if that citizen has previously been arrested for transporting undocumented immigrants.

The computer check revealed no warrants for Alvarado's arrest, no reports that the vehicle was stolen, no reports that the vehicle had been or was currently involved in a crime, no reports that Alvarado was in the midst of a crime, and no reports that Alvarado was about to commit a crime. Nothing showed up but a prior *arrest*. Thus, the computer check came back clear. At that point, having decided that he would not issue a citation, Wall should have allowed Alvarado to leave because the purpose of the stop had been fulfilled.

At best, Wall had a *hunch* that Alvarado might have been engaged in transporting undocumented immigrants. However, a hunch is not enough. Alvarado's Fourth Amendment rights

were violated when Wall prolonged his detention after the computer check came back clear.[21]

## CONCLUSION

Because the government has failed to meet its burden of showing that Alvarado's prolonged

detention was objectively reasonable, Alvarado's Motion to Suppress is GRANTED.

**SO ORDERED**, this the 2nd day of October, 2013.

s/Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[21]Presumably, because the subsequent search of the vehicle did not yield anything, the parties have not focused on the constitutionality of the search.  However, because the detention itself was illegally prolonged, any evidence produced by the subsequent search is fruit of the poisonous tree and is inadmissible.  *United States v. Martinez*, 486 F.3d 855, 864 (5th Cir. 2007); *Jenson*, 462 F.3d at 408.  The government devotes two sentences in its brief to the subsequent search, to wit: "The consent given by the defendant for Trooper Wall to search the vehicle was completely voluntarily given. The defendant clearly stated to the Trooper, 'go ahead, search,' and points to the car.'" Docket No. 26, at 9. But, by the time the search began, more than 25 minutes had passed since Wall activated his blue lights.  The search itself would take nearly fifteen minutes.  VR 26:41-41:37.  Twelve minutes into the search, the ICE truck arrived, and ICE began its investigation.  VR 38:25.  Alvarado was led away at the hour mark of the video.  VR 1:00:22.  For an entire hour, he stood along the side of the highway for reasons not tied to reasonable suspicion that he had committed a crime or was engaged in the commission of a crime.  This is unacceptable.